FILED
2017 Apr-20  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOSE CAPELES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO.** |
| | ) | |
| **LIFE INSURANCE COMPANY** | ) | |
| **OF NORTH AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Comes now the Plaintiff, Jose Capeles, and hereby files his Complaint against Life Insurance Company of North America.

## PARTIES

1.     The Plaintiff, Jose Capeles is an insured under Long Term Disability Policy No. LK-0980024, ("the Plan").

2.     Defendant, Life Insurance Company of North America ("LINA") is the Administrator of Long Term Disability Policy No. LK-0980024.   Upon information and belief, LINA is a foreign corporation incorporated in the Commonwealth of Pennsylvania, which conducts business generally in the State of Alabama and specifically within this District.

## JURISDICTION AND VENUE

3.     This action arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.  Plaintiff asserts claims for long-term disability benefits, enforcement of ERISA rights and statutory violates of ERISA under 29 U.S.C. §1132.  This Court has subject matter jurisdiction under ERISA without respect to the amount in controversy or the citizenship of the parties.  29 U.S.C. §1132(a),(e)(1) and (f) and 28 U.S.C. §1131.  Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b).

## INTRODUCTION

4.     The traditionally held purpose of the ERISA statute is "to promote the interest of employees and their beneficiaries in employee benefit plans."  *Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983).  Mr. Capeles, as an employee insured for disability, was supposed to be treated as a beneficiary by Defendant as statutory fiduciary.  Instead, Defendant has victimized Mr. Capeles by engaging in utterly reprehensible claim handling procedures.  The shortcomings of ERISA as it relates to claims for "welfare" benefits have been exploited by the Defendant to avoid paying Mr. Capeles' valid claim that would otherwise be payable under state insurance law.

5.     In fact, Cigna Insurance Company, on information and belief, a subsidiary of Defendant LINA, has made a business practice of engaging in the

bad faith claim handling procedures of the same type employed in terminating Mr. Capeles' benefits.  In accordance with the regulatory settlement agreement with various states, entered into by Cigna Insurance Company on May 13, 2013, Cigna agreed to take corrective actions to enhance claim procedures to improve the claim handling process of current and future insureds.  Among other things, Cigna agreed to provide clear and express notice to claimants of the information to be collected and take reasonable steps to work with the claimant to identify and obtain such information.  Unfortunately, Mr. Capeles is not a resident of a state party to the regulatory settlement agreement, as Cigna's ambiguous procedures in the processing of his claim are of the same type that the state commissioners found improper and a clear breach of the objectives of the settlement agreement entered into by Cigna in 2013 and flies in the face of purpose of the ERISA statute.  As described in more detail below, Defendant clearly continues its practice of engaging in bad faith claim handling and Mr. Capeles, at minimum, is patently entitled all relief that ERISA provides.

## STATEMENT OF FACTS

6.    Mr. Capeles is an insured under Long Term Disability ("LTD") Policy No. LK-0980024 ("the Plan") sponsored by his employer, Waste Management, and administered by Life Insurance Company of North America ("LINA").    The policy provides insureds, like Mr. Capeles, long term disability benefits.

7.      Mr. Capeles has a high school education and a small amount of college.   Mr. Capeles served as a paratrooper in the United States military, completing thirty-eight jumps.  Mr. Capeles served approximately six years in the military before being honorably discharged.

8.      Mr. Capeles worked for Waste Management for approximately four years as a Lead Closing Inside Sales Representative.  Mr. Capeles worked until his disabilities and doctors' orders prevented him from returning to work.

9.      Mr. Capeles' disabling conditions include depression, panic disorder, anxiety, insomnia, lumbar radiculopathy, chondromalacia, osteoarthrosis, plantar fascial fibromatosis, obesity, asthma, non-alcoholic fatty liver and chronic pain. Additionally, Mr. Capeles suffers from the side effects of medications his treating physicians prescribe.  Mr. Capeles' medications cause cognitive impairments that make it impossible for him to sustain employment.

10.      Mr. Capeles applied for Social Security Disability benefits due to his multiple impairments and was subsequently approved by the Social Security Administration.  The Social Security Administration gave Mr. Capeles an onset date of February 19, 2014.  (See Correspondence dated May 19, 2015, attached hereto as Exhibit "A").

11.      Mr. Capeles also has been found to be 70% disabled by the Veteran's Administration.  (See VA Medical Records, attached hereto as Exhibit "B").

12.     On February 27, 2014, Mr. Capeles began receiving Short Term Disability Benefits from LINA through his employee insurance plan at Waste Management.   (See Correspondence dated August 26, 2014, attached hereto as Exhibit "C").

13.     Mr. Capeles subsequently filed for Long Term Disability under the Plan.  By letter dated August 26, 2014, LINA informed Mr. Capeles that his LTD claim was approved.  LINA's letter also stated that Mr. Capeles was only approved for his mental illness and not his physical impairments and as a result, his benefits would cease as of August 27, 2015.  (See Correspondence dated August 26, 2014, attached hereto as Exhibit "D").

14.   By letter dated February 9, 2015, LINA informed Mr. Capeles that it would be conducting a review of his LTD claim.   (See Correspondence dated February 9, 2015, attached hereto as Exhibit "E").

15.     By letter dated March 17, 2015, LINA informed Mr. Capeles that after completing a review of his claim, LINA would not pay any benefits after March 17, 2015.  (See Initial Denial Letter, dated March 17, 2015, attached hereto as Exhibit "F").

16.   Mr. Capeles appealed LINA's erroneous decision to discontinue his LTD benefits.  LINA denied Mr. Capeles' appeal by letter dated May 19, 2015. Despite the detailed medical records provided by Mr. Capeles, LINA's denial letter

stated the medical records did not provide "measured documentation, imaging, or examination to support your that your condition and symptoms would have severely impacted your ability to function in your regular occupation."   (See Denial Letter, dated May 19, 2015, attached hereto as Exhibit "G").

17.    Through counsel, Mr. Capeles appealed LINA's decision to terminate his LTD benefits by letter dated November 11, 2015.  The appeal also included up to date medical records from the Veteran's Administration.  (See Appeal Request Correspondence, dated November 11, 2015, attached hereto as Exhibit "H").

18.    By letter dated November 17, 2015, LINA confirmed the receipt of Mr. Capeles' appeal.  (See Correspondence dated November 17, 2015, attached hereto as Exhibit "I").  LINA sent another letter dated December 10, 2015 stating that Mr. Capeles' claim was under review. (See Correspondence dated December 10, 2015, attached hereto as Exhibit "J").

19.    By letter dated December 22, 2015, LINA informed Mr. Capeles' counsel that it may require a forty-five day extension to resolve Mr. Capeles' appeal.  (See Correspondence dated December 22, 2015, attached hereto as Exhibit "K").

20.    By letter dated February 26, 2016, LINA notified Mr. Capeles' counsel that a forty-five day extension would be required to make a decision regarding Mr. Capeles' appeal.  (See Correspondence dated February 26, 2016,

attached hereto as Exhibit "L").

21.    By letter dated March 30, 2016, LINA informed Mr. Capeles' counsel that it had scheduled a peer review of the medical records in file.   The letter also stated that LINA would contact Mr. Capeles within thirty days of the letter.  (See Correspondence dated March 30, 2016, attached hereto as Exhibit "M").

22.    LINA's paid medical reviewers completed the peer reviews and LINA used the resulting opinions to deny Mr. Capeles' appeal.   LINA informed Mr. Capeles of its decision by letter dated April 28, 2016.   LINA's denial letter informed Mr. Capeles that he had exhausted all administrative levels of appeal and no further appeals would be considered.  (See Denial Correspondence dated April 28, 2016, attached hereto as Exhibit "N").

23.    Despite providing proof of his disability both before the termination of benefits and throughout the appeals process, LINA refused to award additional benefits.  The final denial letter, like the previous letters, improperly found that Mr. Capeles did not meet the Policy definition of disabled.  LINA's denial letters are riddled with attempts to "cherry-pick" the record for evidence that supports its termination and give little or no weight the plethora of evidence provided by the Mr. Capeles' treating physicians, the VA and the SSA that supports Mr. Capeles' disability.

24.    As of this date, Ms. Capeles has been denied benefits rightfully owed

to him under the Plan.  LINA's decision to terminate benefits under Mr. Capeles' long-term disability policy was grossly wrong, without basis and contrary to the evidence.

25.    Mr. Capeles has met and continues to meet the Plan's definition of disabled.

26.    The Defendant did not establish and maintain a reasonable claim procedure or provide a full and fair review of Mr. Capeles' claim as required by ERISA.  Instead, the Defendant acted in its own pecuniary interests and violated ERISA by conduct including but not limited to the following: breaching its fiduciary duty to the Plaintiff; reviewing the claim in a manner calculated to reach the desired result of denying benefits; failing to properly consider and credit the medical opinions of Mr. Capeles' medical providers; and failing to properly consider and credit the determination of the SSA and the VA.

27.    Upon information and belief, LINA evaluated and paid all claims under the LTD Plan at issue, creating an inherent conflict of interest.

28.    Upon information and belief, the Plan does not grant discretionary authority to determine eligibility for benefits to Defendant or to any other entity who may have adjudicated Mr. Capeles' claim. Therefore, the Court should review the Plaintiff's claim for benefits under a *de novo* standard. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). In the alternative, the denial of

Plaintiff's benefits constitutes an abuse of discretion.

29.    Mr. Capeles has exhausted any applicable administrative review procedures and Defendant's refusal to pay benefits is both erroneous and unreasonable.

## DEFENDANT'S WRONGFUL AND UNREASONABLE CONDUCT

### A. Defendant's Determination that Plaintiff does not Meet the Definition of Disability as Stated in the Policy was Both Erroneous and Unreasonable.

30.    The LTD Plan at issue states, in part:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1.    unable to perform the material duties of his or her  Regular Occupation. For drivers only, this includes being unable to meet the driving requirements as outlined under the Department of Transportation regulations; and
2.    unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
1.    unable to perform the material duties of any occupation   for which he or she is, or may reasonably become, qualified  based on education, training or experience; or
2.    unable to earn 60% or more of his or her Indexed   Earnings.

(See Insurance Policy, Attached hereto as Exhibit "O", at page 2).

31.    According to LINA, Mr. Capeles was disabled from February 2014 through March 17, 2015.  LINA did not provide any particular reason or event that

indicated why Mr. Capeles would suddenly improve after the termination date. LINA appears to have arbitrarily settled on March 18, 2016 as the date that Mr. Capeles would be able to perform the duties of his own occupation, contrary to the opinion of his treating physicians.  The policy defines disability as the inability to perform the material duties of Mr. Capeles' own occupation. Not, as Cigna reasons, the ability to lift 20 pounds.  Obviously, the material duties of a Lead Closing Inside Sales Representative are more than just physical requirements.   To fail to consider the cognitive ability needed to complete the material duties of Mr. Capeles' occupation is erroneous and unreasonable.  Mr. Capeles' struggle to cope with pain, fatigue and side effects from his medication all erode his ability to maintain the cognitive skills necessary to perform his work.

32.    LINA ignored medical records that clearly show that Mr. Capeles would not be able to complete the duties of his occupation.  In the peer review ordered by LINA, the paid reviewer erroneously stated "There is not noted to be more thorough cognitive testing with his complaints of cognitive impairments, including no neuropsychological testing or even basic serial cognitive testing." The paid reviewer ignored records showing cognitive tests performed by physicians who examined Mr. Capeles in person.  Dr. Zerrudo, who examined Mr. Capeles in person, noted in his September 20, 2014 notes that Mr. Capeles appeared "slow and sad" and exhibited "obsessive tendencies" when answering

questions during a basic cognitive test.  Dr. Zerrudo noted there were limitations in concentration and persistence, social interactions and adapting to change. (See MSDI Medical Records, attached hereto as Exhibit "P").

33.    VA records provided to LINA further showed that Mr. Capeles' treating doctors opined that Mr. Capeles is unable to work.  VA treatment notes from August 22, 2014 show that LINA called the VA to ask about Mr. Capeles' ability to work and the psychiatrist spoke with LINA representatives on speaker phone with Mr. Capeles present in the office.  The notes further state that "Vet's anxiety, concentration and memory problems, chronic pain, and difficulty in breathing have rendered him unable to function in his employment." (See VA Treatment Notes, attached hereto as Exhibit "Q"). VA treatment notes from April 29, 2015 state that Mr. Capeles' suffers from occupational and social impairment with reduced reliability and productivity.   (See VA Treatment Notes dated September 9, 2014, attached hereto as Exhibit "R").

34.    The VA also noted in its treatment notes from August 1, 2014 that Mr. Capeles' anxiety and depression can be attributed to his physical disabilities.  (See Exhibit "R").  The VA records show that Mr. Capeles was continuously treated for physical conditions and that no improvement was noted.  In fact, notes from June 26, 2014 detailing Mr. Capeles' treatment for spinal stenosis and disc herniation, state the treatments Mr. Capeles received "provide temporary improvement only."

(See VA Treatment Notes dated June 26, 2014, attached hereto as Exhibit "S").

35.    LINA also asked Mr. Capeles' treating physician, Dr.  Nha Lien, to complete a Certification of Health Care Provider for Employee's Serious Health Condition.  Dr. Lien completed a Certification for LINA as requested.  When asked whether Mr. Capeles was unable to perform any of his job functions, Dr. Lien answered "yes."  Dr. Lien also answered "yes" when asked "Will the condition cause periodic flare-ups preventing the employee from performing his/her job functions."  (See Certification of Health Care Provider, attached hereto as Exhibit "T").

36.    LINA's own paid medical reviewer stated that Mr. Capeles would have restrictions working even a sedentary level job.  LINA's reviewer stated that Mr. Capeles would be able to sit and stand, each, with the opportunity to change positions, for a total of four hours a day.  (See Peer Review, attached hereto as Exhibit "U").  Mr. Capeles' job clearly requires him to sit for more than four hours a day.

37.    Although Mr. Capeles' medical records show continuous treatments and doctor visits for both mental and physical disabilities, LINA ignored the plethora of medical records provided.  LINA instead relied on paper reviews completed by paid medical reviewers.

38.    LINA's ludicrous and wholly unsupported determination is contrary to the opinions of Mr. Capeles' treating physicians and the determination of the Social Security Administration and the Veteran's Administration.   Mr. Capeles' treating physicians, who have no stake in the outcome of the case, reached the opinion that he was disabled based on their numerous examinations..

39.    Even if LINA could somehow overcome the inadequacy of its "evidence" upon which its decision was based, its findings would still stand alone as the only such findings in the Administrative Record suggesting that Mr. Capeles might somehow have been able to return to work, and would remain overwhelmed by numerous treatment records suggesting the opposite. Accordingly, no reasonable mind could accept as adequate the evidence upon which Defendant relied to support the decision to terminate Mr. Capeles' benefits.

40.    Although a court may not automatically accord special deference to a treating physician's opinion when reviewing a disputed ERISA claim, a court also "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825-834 (U.S. 2003).   The Supreme Court has held that plan administrators are not required to accord special deference to the opinions of treating physicians. Plan administrators may not, however, "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating

physician." *Id.* at 834.

**B.    Defendant's Decision to Terminate LTD Benefits was not Supported by Substantial Evidence.**

41.    In its consideration of Mr. Capeles' LTD claim, LINA only retained paid reviewers to assess his file.  The Plan specifically provides "The Insurance Company, at its expense, will have the right to examine any person for who a claim is pending as often as it may reasonably require." (<u>See</u> Exhibit "O", at page 16).

42.    LINA's denial letter stated that the paid reviewers found there was "insufficient information to support a functional loss as a result of a functional impairment."   LINA's denial letter also stated that LINA did not find any neuropsychological evaluations or cognitive testing in Mr. Capeles' medical records. (<u>See</u> Denial Letter, attached as Exhibit "N").  LINA felt the information was lacking, yet important enough to be the reason for denying Mt. Capeles' claim. However, LINA made no attempt to secure an independent medical consultation, relying instead on the opinions of paid reviewers who never examined Mr. Capeles.

1.    <u>LINA's Reliance on Paper-Reviews to Deny Benefits on the Basis of Insufficient Evidence Was Arbitrary and Capricious.</u>

43.    Mr. Capeles' claim file is replete with medical records from his treating physicians extensively detailing his limitations. Mr. Capeles' physicians' assessments, treatment and medications they prescribed and administered,

demonstrate that Mr. Capeles' diagnosed conditions and symptoms of those conditions were extremely debilitating.

44.     The records of Ms. Capeles' long-standing medical providers, who have no stake in the outcome of the case, clearly evidence that he is disabled based on their numerous personal examinations, testing, and procedures.  LINA's hired medical reviewers, on the other hand, did not examine Mr. Capeles. LINA's paid medical reviewers admitted in their assessment that they were unclear on certain aspects of Mr. Capeles' records.  One paid reviewer noted that Mr. Capeles had a drug screen that came back negative for some of his prescribed medication.  (See Peer Review, attached hereto as as Exhibit "V").  The same reviewer also noted that Mr. Capeles' doctors were not pursuing aggressive treatments which "one would expect." (See Exhibit "V").  Instead of attempting to have Mr. Capeles explain these discrepancies or examining the records further for answers, LINA's paid reviewers instead made a decision without the information.  The conclusion that Mr. Capeles was not disabled was based merely on hired reviewer's cherry-picked assessment of his medical records. *See Hoover v. Provident Life and Accident Ins. Co.*, 290 F.3d 801,809 (6th Cir. 2002)(finding that evidence in the administrative record did not support the revocation of benefits because the only doctors that disagreed with the treating physicians were non-examining consultants hired by the insurance company); *see also Kalish v. Liberty Mutual*, 419 F.3d 501,

508 (6th Cir. 2005)("[w]hether a doctor has physically examined the claimant is indeed one factor that we may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician").

45.   In weighing the opinions of Mr. Capeles' providers against those of the reviewers retained by LINA, the following factors should be considered: (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) other relevant factors. *See Karanda v. Connecticut Gen. Life Ins. Co., et al.,* 158 F. Supp. 2d 192, 205 and n.8 (D. Conn. 2000) (citing *Durr v. Metropolitan Life Ins. Co.,* 15 F. Supp. 2d 205, 213 (D. Conn. 1998)).  The Court in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (U.S. 2003) recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient as an individual." While *Nord* provides that it is not a requirement to adopt a per se rule to treat treating physicians' opinions with more weight than those of hired medical reviewers, "[c]ommon sense and a stream of legal precedent suggest, however, factual determinations of a treating physician are objectively more reliable." *Burt v. Metro. Life Ins. Co.*, 2006 U.S. Dist. LEXIS 97559 (N.D. Ga. Jan. 31, 2006);  *see also Finazzi v. Paul Revere Life Ins. Co.*, 327 F.Supp.2d 790, 795-96 (W.D. Mich.

2004) ("the Court is not obliged to 'rubber stamp' [defendant's] termination of benefits . . .").

46.     Paid experts are more often than not pre-disposed or preconditioned. Courts have consistently expressed their skepticism of such "experts" and held their reviews to be the very essence of arbitrariness and capriciousness. *Bennett v. Kemper HAT-Svcs, Inc.* 514 F. 3d 547, 554-55 (6th Cir. 2008); *Montour v. Hartford Life and Acc. Ins. Co.,* 588 F. 3d 623 (9th Cir. 2009); *Regula v. Delta Family Care Plan* 226 F.3d. 1130, 1143 (9th Cir. 2001).  The Supreme Court has acknowledged that "physicians repeatedly retained by benefits plans may have an 'incentive to make a finding of "not disabled" in order to save their employers money and preserve their own consulting agreements.'" *Nord,* 538 U.S. 822, 832, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003).  The fact that their reports are consistently in conflict with the opinion of treating doctors' determinations should be viewed as evidence of a structurally conflicted process that results in bias.  Clearly, in Mr. Capeles' case, these decisions indicate that his treating physicians' evaluations should be afforded greater weight than the opinions of LINA's file reviewers, especially since LINA did not have him submit to an independent medical exam allowed by the Plan.

2.     Defendant's Failure to Properly Credit Mr. Capeles' Well-Documented Subjective Complaints Was Arbitrary and Capricious.

47.     Admittedly, some of Mr. Capeles' disabling impairments have subjective components; however, they have been diagnosed by his treating physicians based on his medical history, extensive testing, and physical examinations. Well-documented subjective reports such as Mr. Capeles' should be considered credible and given appropriate weight.

48.     In *Quigley v. UNUM Life Ins. Co. of America,* 340 F. Supp. 2d 215, 224  (D. Conn. 2004), the Court held "[w]here the record reveals well-documented complaints of chronic pain, and there is no evidence in the record to contradict the claimant's complaints, the claim administrator, and the court, cannot discredit the claimant's subjective complaints."

49.     An administrator may not exclude a claim for lack of objective medical evidence unless that standard was made "clear, plain and conspicuous enough [in the policy] to negate layman [plaintiff's] objectively reasonable expectations of coverage." *Saltarelli v. Bob Baker Group Medical Trust et al.,* 35 F.3d 382, 387 (9th Cir. 1994); *see also May v. Metro. Life Ins. Co.,* 2004 U.S. Dist. LEXIS 18486, *26 (N.D. Cal. Sept. 9, 2004) ("MetLife abused its discretion by requiring that Plaintiff meet an additional requirement for eligibility beyond those imposed by the Plan."); *see also Duncan v. Continental Cas. Co.,* 1997 U.S. Dist. LEXIS 1582, *15-17 (N.D. Cal. Feb. 10, 1997) (finding an insurer improperly denied the claim of the plaintiff, who had fibromyalgia, due to a lack of "objective

medical evidence" to support her disability claim).

50.    In *Creel v. Wachovia Corp.*, 2009 U.S. App. LEXIS 1733 (11th Cir. Fla. Jan. 27, 2009) and *Oliver v. Coca-Cola Co.,* 497 F.3d 1181, 1196-97 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007), the United States Court of Appeals for the Eleventh Circuit considered when it was substantively reasonable to deny benefits for disabilities involving subjective elements. In *Creel,* the plaintiff applied for disability benefits based on a diagnosis of depression, anxiety, and migraine headaches. She received long-term disability benefits, but the benefits were terminated after twenty-four months pursuant to a mental disorder limitation. She sued the insurance company to recover additional benefits based on her migraine headaches. She provided chart notes, standard diagnoses, and lab reports to support her claim, but the district court entered summary judgment against her because she did not provide objective evidence. The Court of Appeals vacated the summary judgment order, explaining:

> Our prior cases provide guidance for assessing the reasonableness of benefits denials for disabilities that involve some subjective element, such as migraines, fibromyalgia, and chronic pain syndrome. . . . When the plan has no [objective evidence requirement,] we evaluate the reasonableness of the decision in light of the sufficiency of the claimant's subjective evidence and the administrator's actions. Assuming that the claimant has put forward ample subjective evidence, we look at what efforts the administrator made to evaluate the veracity of her claim, particularly focusing on whether the administrator identified any objective evidence that would have proved the claim and on what kinds of independent physician evaluations it conducted. Accordingly, an administrator's decision to

deny benefits would be unreasonable if it failed to identify what objective evidence the claimant could have or should have produced, even if the administrator submitted the file for peer review.

2009 U.S. App. LEXIS 1733, [WL] at *7.

51.    Applying this standard, the Court of Appeals in *Creel* found that the records offered by the plaintiff to corroborate her subjective complaints of disabling headaches were sufficient to support her claim and held that the administrator's decision was both wrong and unreasonable. 2009 U.S. App. LEXIS 1733, [WL] at *8.  Similarly, in *Oliver*, the plaintiff sued his employer to recover long term disability benefits based upon radiculopathy and associated cervical pain, fibromyalgia, and chronic pain syndrome. The Court of Appeals held that it was arbitrary and capricious for an employer to deny benefits for disabilities involving elements of subjective pain when the claimant provided ample evidence and the administrator never requested any additional kind of evidence. *Oliver,* 497 F.3d at 1196-97.

52.    Here, Mr. Capeles provided both extensive objective and subjective evidence of his disabilities.   Mr. Capeles' medical records contain well-documented complaints of chronic pain resulting from his numerous physical impairments.  Mr. Capeles' records show documented mental impairments as well. In fact, Mr. Capeles' records show that his physical disabilities have a direct effect on his mental state. (See VA treatments notes, attached as Exhibit "R").

Accordingly, Defendant's decision to deny disability benefits was substantively unreasonable.

**C.    Defendant Unreasonably Failed to Properly Consider Mr. Capeles' Non-Exertional Limitations and the Cognitive Requirements of his Occupation.**

53.    As previously stated, the Defendant presumably found that Mr. Capeles is capable of performing sedentary work. (See Denial Letter, attached as Exhibit "N"). However, Mr. Capeles' own occupation and any occupation that he would be reasonably suited to perform requires far more than only the ability to perform the physical requirements of the job.  In *Demirovic v. Bldg. Serv. 32 B-J Pension Fund,* 467 F.3d 208, 213-14 (2d Cir. 2006)*,* the Court stated*,* "[A] reasonable interpretation of a claimant's entitlement to payments based on a claim of 'total disability' must consider the claimant's ability to pursue gainful employment in light of all the circumstances." Thus, an administrator must consider whether a beneficiary has "the vocational capacity to perform any type of work . . . that actually exists in the national economy." *Id.* at 213-215.

54.    The Court must also consider non-exertional limitations including (1) intellectual and psychological limitations, including those related to the side effects of prescription medications and pain; (2) limited manual dexterity; and (3) a limited ability to remain seated for an extended period of time. Such non-exertional limitations can be important aspects of vocational capacity. *See Rabuck v. Hartford*

21

*Life and Accident Ins. Co.,* 522 F. Supp. 2d 844, 876-77 (W.D. Mich. 2007) (holding that failure to consider non-strength limitations of former company president with short-term memory limitations rendered Transferable Skills Analysis "incredible").

55.     The LTD policy at issue defines disability as the inability to perform the *material duties* of one's Regular Occupation. (See LTD Policy, attached as Exhibit "O").   Despite being provided with a job description by Mr. Capeles' employer, Cigna failed to even identify the material duties of Mr. Capeles' occupation.  It is certain that the material duties of Mr. Capeles' occupation or any occupation require far more than the ability to lift 20 pounds, the only requirement Cigna details in its denial. (See Denial Letter, attached as Exhibit "N"). Though all evidence indicates that Mr. Capeles would not physically be able to perform at even a sedentary exertional level, it is clear that the material duties of his job as a Lead Closing Inside Sales Representative also has non-exertional requirements in addition to physical demands that Cigna simply did not address.

56.     Mr. Capeles' medical records show his consistent complaints of cognitive problems, including medication side effects, and his physicians' resulting treatments.  VA treatment notes from August 8, 2014 show that Mr. Capeles' complained of side effects from his medication.  (See VA Treatment Notes, attached hereto as Exhibit "W").  Mr. Capeles was also evaluated by Dr. Zerrudo

of the Phoenix Disability Determination Service. Dr. Zerrudo noted that Mr. Capeles exhibited side effects from his medications. (See Exhibit "P").   Dr. Zerrudo concluded his functional assessment by finding that Mr. Capeles had limitations and was credible and consistent throughout his exam.   (See Exhibit "P").

57.    Mr. Capeles' concentration, persistence and pace is so severely limited by constant pain, fatigue, and by the documented and expected side effects from his prescribed medications that he is unable to perform any work at any exertional level on a full-time basis.  Further, both exertion and the inability to change positions as needed exacerbate Mr. Capeles' condition.  As noted by physicians at the VA, Mr. Capeles' physical state exacerbates his depression and anxiety. (See VA Treatment Notes, attached as Exhibit "R") Undoubtedly, a return to work in any capacity would increase Mr. Capeles' pain, requiring additional rest, medication and treatment which would lead to the inability to maintain an acceptable absentee rate.

### D.    Defendant Failed to Justify Taking a Position Different from the SSA on the Question of Disability.

58.    Defendant failed to discuss the favorable SSA determination and dismissed it entirely, providing no justification for reaching a decision contrary to that of the SSA.

59.     In stark contrast to LINA's unsupported and erroneous decision, the Social Security Administration found Mr. Capeles disabled and granted him SSD benefits. (See SSA Notice, attached as Exhibit "A").

60.     When considering whether a claimant is disabled under sections 216(i) and 223(d) of the Social Security Act, the agency must determine whether the claimant has the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

61.     Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a)).  The steps are followed in order.  If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

62.     At step one, the agency must determine whether the claimant is engaged in substantial gainful activity (20 CFR 404.1520(b)).  If an individual engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are and regardless of his or her age, education, or work experience.  If the individual is not engaged in SGA, the analysis proceeds to the second step.

63.     At step two, the agency must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c)).     An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities.  If the claimant does not have a severe medically determinable impairment or combination of impairments, he or she is not disabled.  If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

64.     At step three, the agency must determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).  If the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of a listing and meets the duration requirement (20 CFR 404.1509), the claimant is disabled.  If it does not, the analysis proceeds to the next step.

65.     Before considering step four, the agency must first determine the claimant's residual functional capacity (20 CFR 404.1520(e)).  An individual's residual functional capacity is his or her ability to do physical and mental work activities on a sustained basis despite limitations form his or her impairments.

66.     Next, the agency must determine at step four whether the claimant has

the residual functional capacity to perform the requirements of his or her past relevant work (20 CFR 404.1520(f)).  The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established.  If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

67.    At the last step of the sequential evaluation process (20 CFR 404.1520(g)), the agency must determine whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.  If the claimant is able to do other work, he or she is not disabled. If the claimant is not able to do other work and meets the duration requirement, he or she is disabled.

68.    Courts have determined that the Social Security Administration's disability decision should be a "significant factor" in the consideration of an administrator's decision to terminate plaintiff's disability benefits. *Glenn,* 461 F.3d at 669. *See also Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 294 (6th Cir. 2005) ("the SSA determination, though certainly not binding, is far from meaningless"). Even though a favorable decision in a Social Security disability appeal does not make a claimant automatically entitled to disability benefits under an ERISA plan:

[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary or capricious. *Bennett v. Kemper Nat. Services, Inc.,* 514 F.3d 547, 554 (6th Cir. 2008). *See also DeLisle v. Sun Life Assur. Co. of Canada,* 558 F.3d 440, 446 (6th Cir. 2009).

69.    Indeed, "a decision by a plan administrator to seek and embrace an SSA determination for its own benefit, and then ignore or discount it later, casts additional doubt on the adequacy of their evaluation of . . . [a] claim[.]" *Calvert v. Firstar Finance, Inc.*, 409 F.3d 286, 294-95(6th Cir. 2005).

70.    In *Darland v. Fortis Benefits Insurance Company,* 317 F.3d 516 (6th Cir. 2003), the Sixth Circuit held that a court should consider a favorable social security decision as evidence that an insurance company acted arbitrarily and capriciously by requiring a claimant to apply for social security, then ignoring the favorable social security decision. The Court explained:

> [I]t is totally inconsistent for Fortis to request that Darland apply for social security disability benefits, yet avail itself of that social security determination regarding disability to contend, at the same time, that he is not disabled. ... Though not directly applicable in this case, the principles of judicial estoppels certainly weigh against Fortis taking such inconsistent positions.

317 F.3d at 530.

71.     Recently, the Eleventh Circuit examined the juxtaposition between a Defendant insurer's self-interested SSD benefit policy requirements and its failure to give a SSA decision appropriate weight in its own disability denial determination under that same policy.  *Melech v. Life Insurance Co. of N.A.*, 739 F.3d 663 (11th Cir. 2014).   On appeal, the *Melech* Court described Defendant LINA's policy in that case as follows:

> To summarize, the Policy effectively requires all claimants to apply for SSDI [Social Security Disability Income] at the outset; if a claimant fails to do so, LINA can reduce her benefits under the Policy, if any, by the amount of SSDI LINA says she could have gotten. In the event that LINA decides to pay a claim, the Policy allows LINA to hold the claim open, at least with respect to the total amount LINA must pay, until the SSA reaches a final decision. LINA may assist the claimant in obtaining SSDI, even going so far as to transfer the medical evidence that LINA gathered to LINA's vendor, who then presumably transfers it to the SSA. And if the SSA denies the claimant's application, LINA can force the claimant to exhaust her administrative appeals. All this effort makes perfect sense from LINA's perspective because--having decided to pay the claim--every dollar the claimant gets from the SSA is one less dollar LINA has to pay.

*Melech*, 739 F.3d at 668. Given these policy provisions and the fact that LINA, at the time of its denial, did not have the evidence plaintiff presented to the SSA, the Court held "***that LINA had an obligation to consider the evidence presented to the SSA***." *Id.* at 666 (emphasis added).  The Court went on to state that "in light of these openly self-interested efforts, ***we are troubled by the implication of LINA's actions in Melech's case, where it ignored her SSDI application and the evidence***

***generated by the SSA's investigation once it no longer had a financial stake in
the outcome.***"  *Id.* at 674  (emphasis added).

72.     In the matter at hand, the Plan required Mr. Capeles to apply for
Social Security disability benefits and exhaust the highest level of SSA appellate
review in the event such SSD benefits were initially denied.  Further, like the
Defendant insurer in *Melech*, LINA here required Mr. Capeles to agree to turn over
SSD benefits to LINA . (See Policy, Exhibit "O").  In fact, LINA began
demanding reimbursement for the alleged overpayment created by Mr. Capeles'
Social Security award before a decision had even been made on his appeal.  (See
Payment Request, attached hereto as Exhibit "X").

73.     LINA wrote to Mr. Capeles' counsel on at least three occasions about
needing information from the SSA and stated that the claim would be delayed so
the information could be evaluated.  (See Correspondence dated December 22,
2015, attached hereto as Exhibit "Y"; Correspondence dated January 8, 2016,
attached hereto as Exhibit "Z"; Correspondence dated February 5, 2016, attached
hereto as Exhibit "AA").  Even though LINA requested an extension to review the
Social Security file, LINA failed to give any credit to the SSA record and
dismissed the information because LINA felt its own paid reviewers' opinions
were more current. (See Denial Letter, attached as Exhibit "N").

## CAUSES OF ACTION
## COUNT ONE
## ERISA (Claim for Benefits Owed under Plan)

74.     Plaintiff hereby incorporates by reference each and every fact as if it was restated herein.

75.     At all times relevant to this action, Mr. Capeles was a participant of the group Long-Term Disability Policy No. LK-0980024 ("the Plan") underwritten by Life Insurance Company of North America ("LINA") and issued to his employer, within the meaning of 29 U.S. C. §1002(7), and was eligible to receive disability benefits under the Plan.

76.     As more fully described above, the termination and refusal to pay Mr. Capeles benefits under the Plan for the period from at least on or about March 17, 2015 through the present constitutes a breach of Defendant's obligations under the Plan and ERISA.  The decision to terminate benefits to Mr. Capeles constitutes an abuse of discretion as the decision was not reasonable and it was not based on substantial evidence.

77.     Mr. Capeles brings this action to recover benefits due to him and to enforce his rights under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court to enter judgment for Plaintiff and otherwise enter an Order providing that:

1.     The applicable standard of review in this case is *de novo*.

2.     That the Court may take and review the records of Defendant and any other evidence that it deems necessary to conduct an adequate *de novo* review;

3.     From at least February 2014 through the present, Mr. Capeles met the Policy's definition of disabled;

4.     Defendant shall pay Mr. Capeles all benefits due for the period from at least March 17, 2015 through the present in accordance with the policy;

5.     Defendant shall pay to Plaintiff such prejudgment interest as allowed by law;

6.     Defendant shall pay Plaintiff's costs of litigation and any and all other reasonable costs and damages permitted by law;

7.     Defendant shall pay attorney's fees for Plaintiff's counsel;

8      Plaintiff shall receive such other relief as the Court deems equitable and just.

Respectfully Submitted,
*/s/ Peter H. Burke*_____
Peter H. Burke (ASB-1992-K74P)

*/s/ Amanda Stansberry-Johns*
Amanda Stansberry-Johns
(ASB-7793-M64S)

**OF COUNSEL**:
BURKE HARVEY, LLC
3535 Grandview Parkway, Suite 100
Birmingham, Alabama 35243
Phone:    205-930-9091
Fax:    205-930-9054
pburke@burkeharvey.com
ajohns@burkeharvey.com

*Attorneys for Plaintiff Jose Capeles*


**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AT:**

LIFE INSURANCE OF NORTH AMERICA
C/O CT CORPORATION SYSTEM
2 North Jackson Street
Suite 605
Montgomery, AL  36104